The court now calls case number 119861, Janice Hampton et al. v. Metropolitan Water Reclamation District of Greater Chicago. Are you ready to proceed? Yes, Your Honor. Apple, are you ready? You may be seated and you may proceed. Good morning. Good morning. Please, the court and counsel, good morning. My name is Jim Zabel. I am one of the attorneys for the Metropolitan Water Reclamation District of Greater Chicago. And please allow me to introduce my colleague, Ellen Marie Avery. Ms. Avery is responsible for so much of our scholarship, an integral part of this effort. And last but not least, if you'll forgive me, please allow me to introduce in absentia our general counsel, Ron Hill. But for the fact that today is a district meeting of the Board of Commissioners, Mr. Hill will be here with us as well. Thank you. We are before the court this morning to determine the answer to the question, does Arkansas Fish and Game Commission versus the United States overrule the Illinois Supreme Court's holding that Pratt versus Rosenfield, that temporary flooding is not a taking? And putting that question in the context of the Hampton and Jaclyn proposed class actions, the question is when the Metropolitan Water Reclamation District or just the district, when the district and or its 125 municipalities or any of the municipalities throughout the state or the publicly owned treatment works throughout the state, the question is these entities, these units of local government are charged with the responsibility of managing storm water and collecting waste water. And the issue in context is do these agencies, does the district and do these other agencies commit a taking when property experiences, private property experiences temporary flooding as a result of a heavy rainfall, heavy rain event. And what I would like to do is this very, very briefly, notwithstanding the fact that it's going to sound like I think the appellate court ruled in the district's favor, what I would like to do is make the observation that in our estimation the appellate court teed this issue up, these matters up perfectly for this court for two reasons. One, it was the scholarship of the appellate court that correctly identified what we are referring to as the limited lockstep approach. And it was the appellate court that articulated for us the three factors to be analyzed in connection with whether or not the so-called limited lockstep approach should apply. The second favor, if you will, that the appellate court did us and did this court is that it reexamined at counsel's behest, at Mr. Dunsby's behest, it reexamined the Panesci case at some length. And specifically, again, the court at that time did not rule in the district's favor. But the observation that the appellate court made is spot on, and that is this, that the Panesci court arguably erroneously treated the federal constitutional taking provision and the Illinois taking provision, the eminent domain provision. They construed those as essentially one and the same. And again, of course, a good part of the thrust of our argument this morning is that is not the case. Our argument in a nutshell, and then I'll flesh it out a little bit, but our argument in a nutshell is this. One, that the limited lockstep approach does not apply in this case. And two, even for the sake of argument, if it did apply, if the court does apply it, the reality is that the cases, Arkansas, Hampton that we rely upon, counsel's clients, Hampton and Jaclyn, that the cases are both factually and legally distinguishable. And again, everyone is entitled to an opinion, but my opinion when I read the appellate court's scholarship is this. They're telling me, what are you folks doing here? You don't belong here. You belong upstairs. This is an issue for the Supreme Court to adjudicate. Before you go too far, let me just ask you. It just seems to me that potentially you are liable either in an action for damages or in eminent domain proceedings. What is the difference? I'm sorry, Your Honor. The difference between the eminent domain proceedings and damages. Oh, thank you. Easy one. Both the United States Supreme Court and this court have consistently held that if you experience a taking, that is, those are direct damages, so to speak, or incidental damages. If your property, on the other hand, in Illinois is harmed, damaged, but not taken, your remedy is the action at law that's provided for in the Constitution, and that translates to a tort case. So a taking of your property, eminent domain and presumably mandamus, damage to your property, a tort case. Did I answer your question? I think so. The limited lockstep approach, as I just said, doesn't apply when property is damaged but not taken. And what the court did for us, the lower court, they articulated the three factors that I alluded to, and those factors are these. The plain language of the Constitution, the custom and practice of the courts, and last but not least, the constitutional conventions and the debates. The language certainly, I think we'd all agree, the language of the Illinois Constitution differs from its federal counterpart in that we do embody that extra provision pertaining to damage to the property. Again, and the reason for that in Illinois, as I've said a couple of times, property taken, eminent domain action. Property damaged, the magic language as provided by law, that's the tort. That's the tort action for damaged property. Since Pratt and for over 60 years, the custom and practice in Illinois has been to make that distinction. Pratt and its progeny do make that distinction. A case that I'm sure counsel will discuss and the court is aware of, Paneshi. For a variety of reasons, I believe that Paneshi is an anomaly. Even the Paneshi court acknowledged that the, well, no, I misspoke, that's not correct. The Paneshi court for its part treated the federal takings clause and the Illinois takings clause as one and the same. A single theory of recovery, if you will. That was erroneous. Last but not least, the convention debates, the committee reports, and here in all candor, I have to give a tip of the cap to the Amici, the Wastewater Association and the Illinois Municipal League. It's no great surprise that the Wastewater Association would seek your permission to file a brief here. And they were certainly helpful to the court, but of very considerable value to this court are the efforts of our colleagues at the Illinois Municipal League that actually did that third prong of the research with us. But to give credit where credit is due, they performed that research and went back to 1870 and came forward to 1970. And I believe you see that set out certainly in their brief and to a certain extent in our briefs. They also indicate very clearly that it was the legislature's intention that our constitution be construed differently than its federal counterpart. I also want to touch on what I said at the top of the conversation, and that is this. The setting aside limited lockstep for the moment, even for the sake of argument, if you found that limited lockstep did apply, or in the alternative, if you wanted to treat this in a vacuum, again, the reality here is the cases are factually and legally distinguishable. The cases being Arkansas Fish and Game, our Supreme Court's decision in Pratt and its progeny, and last but not least, the cases embodying counsel's clients, the cases of Judas Hampton and Jackman. Very, very briefly, Pratt, a case where a municipality made an improvement to the physical plant, so to speak, a roadway and a bridge, and as a consequence of that improvement, the grade of the roadway changed somewhat, and some of the local businesses experienced some degree of flooding during temporary rain, temporary flooding, I should say, during heavy rain events.  Counsel's clients, the complaint speaks for itself. He's alleging that his clients are folks who live in the villages of Westchester and Bellwood and Hillside, and as a consequence of heavy rain events, they experienced both overland flooding, in other words, streams overtopping, and they also allege sewer backups, basement flooding. Look to now Arkansas Fish and Game. There is a case that is completely in a posit to the facts in Pratt, and the facts, more importantly, in counsel's clients' cases, wholly in a posit. Here, I think we can all agree by, like clockwork, every six or seven years, at essentially the same time of the year, with full notice to all involved, they opened the floodgate, if you will, and dewatered property, farmland and some branch land, dewatered property to the detriment of the lower estate, the lower estate being the folks embodying the Arkansas Fish and Game Commission. It had some trees, some forest, valuable timber on that property. I cannot overemphasize the difference between Pratt and between counsel's clients' cases. I don't think there's a doubt in anyone's mind that the Army Corps of Engineers intended to do this. They intended to inundate this property. What the court, in Justice Ginsburg's decision, what the court referred to as the government-induced flooding. We don't have government-induced flooding in Pratt. We certainly don't have government-induced flooding as respects counsel's clients. You have a heavy rain event and the stream's overtopped, and regrettably some folks experienced basement flooding. Is it your position that Pratt would categorically ban recovery under the Illinois Takings Clause for temporary flooding? Yes, it is, Your Honor. That is our position. Of course, as you anticipate, that will form a part of our prayer for relief. The other prong that I wanted to mention was the, I said factually and legally distinct. I want to touch on the legal distinction. Again, both the United States Supreme Court, and you do see this in our briefs, and this court have consistently held that there is a legal distinction between incidental or direct damages, if you will, like those experienced in the Arkansas case with the floodwaters versus consequential damages that we see, or indirect damages, if you will, that we see in the basement flooding cases. It is obviously our belief that the trial court should have evaluated the district's motions to dismiss under the lens of Pratt, if you will. But again, even in the absence of Pratt, and to your point, Justice Garment, even in the absence of Pratt, as I said a few moments ago, the reality is counsel's clients or counsel's causes of action are dramatically different than the cause of action underlying Arkansas fishing aid. Even in the absence of Pratt, to your Honor's question, that would be our position. Certainly, I don't want to be a revisionist. Do we believe that Pratt is dispositive? Yes, of course. But by the same token, we also believe even in the absence of Pratt, as I said, because these cases are counsel's clients, because their cause of action is factually and legally distinguishable from the so-called government-induced flooding that the folks at Arkansas Game and Fish Commission experienced, that would also be dispositive, in my estimation. What are we asking for? We're asking certainly that this court reverse the appellate court's holding that Pratt, either arguably or effectively, whatever the nomenclature was that the court used, but I think it was effectively, we're asking you to reverse the appellate court's holding that the Arkansas decision effectively overrules this court's decision in Pratt. Certainly in that vein, we're asking that it be reversed, that the decision be reversed, that the matter be remanded to the trial court with directions to grant the district's motion to dismiss. In this vein, we are also, and I think it's a large part of the reason we're all here before you this morning, we, the district, are asking you to hold that temporary flooding experienced as a consequence of a heavy rain event does not give rise to a taking under our Constitution. And last but not least, we are asking you to effectively put Pineschi to rest. We dealt, or dispatched it if you will, we dealt, I think the court is aware from our briefs, we addressed the Pineschi decision several years ago before the first district in the context of the town of Cicero versus Metropolitan Water Reclamation District. And the dispositive count in that lawsuit was predicated on an existing section of the district's original enabling 27 section enabling legislation, so-called Section 19, that still exists. And in all candor, what Section 19 translates to is strict liability and tort. What we were experiencing... Your time has expired, counsel. Thank you. Thank you. Thank you. May it please the court. Counsel. Good morning, your honors. My name is Glenn Dunn. I, along with my co-counsel, Jeffrey Brown, and Angel Bachoff at the counsel table, we represent Ms. Hampton as well as the 37 other plaintiffs in the class that we seek to represent. I'd like to, before I start, thank you for taking the time to honor this case with the review of the highest court in the land. I want to thank you on behalf of my clients. Before I address the things that... Let me just interrupt you. You are claiming only temporary taking. Is that correct? Justice Freeman, when you say temporary taking, I still... When I say temporary taking, at least when Arkansas Game and Fish says temporary taking, it is still a physical intrusion on property and a taking, nonetheless. But, yes, it is of temporary duration. And would this temporary taking have different compensable damages under the domain proceeding rather than under the law for damages? I think it would be different in two ways, your honor. First, I think what your honor is getting at is a distinction under the Illinois Constitution with regard to a taking versus damages. I think if you go to, for instance, the constitutional argument at the 1970 Constitutional Convention, Delegate Foster was talking and it was posed several different scenarios or hypotheticals about what damages would be paid. And I think that they contemplated both under a taking or under where property is only damaged. There would be not only the direct damages as could be estimated by an accountant to the actual property itself, but also consequential damages such as moving expenses or other things that were not directly related to the taking itself. But I'd like to back up for a second based on your question. The question here today is does Arkansas Game and Fish overrule people, that's Ralph Pratt v. Rosenfeld, that temporary floodings can never be takings? And the answer to that question must be yes. And the reason for that is that, as Mr. Zabel mentioned, this court has informed us on many occasions and most recently I think at depth in the decision of People v. Cabayas, Cabayas 2 in 2006. In that opinion, this court has said that they follow what really is an interstitial approach, but the name of it has been given limited lockstep. And what that really means or how this court has applied it is that if a provision of the Federal Constitution, as it relates in this case to the Fifth Amendment, the takings clause of the Fifth Amendment, is identical or similar to the language in the Illinois Constitution, then this court follows a lockstep approach. The language here in Article I, Section 15 of the Illinois Constitution is similar to the language of the Fifth Amendment under the Federal Constitution. The only damage, as Justice Freeman has just pointed out, or the only difference, as Justice Freeman pointed out, is that the Illinois Constitution provides more protection than the Federal counterpart because not only does it protect against damages, or excuse me, takings, but it also protects against damages. But let me back up to Arkansas Game and Fish because that's what we're here to talk about. In Arkansas Game and Fish, the court, the U.S. Supreme Court, clearly and unequivocally stated, and I quote, none of the court's, and it's talking about the Supreme Court, of course, decisions authorizes a blanket temporary flooding exception to the court's takings clause jurisprudence. And the court declined to create such an exception in this case. And it goes on, it's at page 519, at page 522 of Arkansas Game and Fish, they say, government-induced flooding temporary in duration gains no automatic exemption from taking clause inspection. And the reason for that is that, as they said later at page 518, there is no magic formula that allows a court to judge in every case whether a given government interference of property is a taking. And I think when Mr. Zabel answered your question regarding, Chief Justice's question, I believe, regarding, is he saying that every temporary flooding can never be a taking, he answered that question in the affirmative. And that proposition that the MWRD is putting before this court is in direct violation or is directly contradictory to stare decisis and the decisions that have been in this court previously. Coming back to... Let me ask you the converse then. Is every temporary flooding a taking? Absolutely not. And how do we discern or discriminate with the difference? Far be it from me to tell the court how to do it, but I think an excellent guidepost or an excellent start to the analysis is to simply look to Arkansas Game and Fish and to the four factors that they outlined to determine whether or not a temporary flooding would be a taking. They talked about time. They talked about government intent or foreseeability to their actions. They talked about the severity of the interference. All of these factors are incredibly important and also incredibly restrictive. You know, I'm kind of bouncing around now, but since you've asked me that question, it is important to address the arguments that the MWRD has proposed in its brief, that if you find Arkansas Game and Fish over Rose Pratt, that effectively you'd be opening the floodgates to, you know, a tsunami of litigation against them. And that's not true. You know, the two guiding points that Arkansas Game and Fish gave us, and which is well settled law, is that the takings clause is designed to bar government from forcing some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a whole. And when the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner. If you go all the way back to Pompeli, which is, I think, the very first U.S. Supreme Court decision that talks about these rights vis-a-vis flooding, it's 1872, they talk about the importance of guarding against these individual rights, these individually constitutionally guaranteed rights against takings, when you are balancing against what the government purpose is. Counsel, what are we to do with the differences between the Illinois and the federal takings clauses? Well, I think, you know, Justice Freeman probably said it best when he gave his dissent in the People v. Caballos II decision. He said, as he agreed with the majority, and as I think is the thought of this court, that whatever the protections of the federal constitution are is the lowest common denominator of the protections that should be afforded the residents of Illinois. And to the extent that there are additional damages, these special damages that are talked about and contemplated by the courts in a constitutional convention, the court is free to provide more protection and set up more protection above the takings. But it really gets away or avoids the central question that would follow from the overrule of Pratt here, and that is, what is a taking? Arkansas Game and Fish talks about... The Illinois taking clause, the language, protects both against taking and damage to private property for public use without just compensation. The Constitution doesn't, right? The Constitution limits it to takings only, correct. So is that of no significance? No, in fact, it is. In fact, that's why, in the limited lockstep approach, this court is free to provide Illinois residents more protections than the federal constitution. But to follow what appellant has proposed and to overrule the circuit court and the appellate court in this case would be to give Illinois residents less protections than the federal. Is it a different protection? No, not at all. And let's talk about that for a second, I guess. Takings are takings. They can't be denied, they must be paid, right? If you say, okay, it's not a taking, it's a damage, how are you going to classify that? Our proposition is that a claim for damages under the Illinois Constitution is still a constitutionally guaranteed claim. I believe I heard Mr. Zabel suggest in his argument that that would be construed as a tort. If that would be construed as a tort, then it would be subject or could be subject to the Tort Immunity Act. And the Tort Immunity Act would essentially deny any claimant who had suffered a constitutional, a violation of the constitutional rights, it would deny them a remedy. And the jurisprudence is very clear. When you suffer a constitutional taking, the just compensation clause demands and requires a remedy. You know, a case that's very close to that or might even give us some guidance on that issue is First English Evangelical versus County of Los Angeles. That's a United States Supreme Court case from 1987. It was a regulatory taking. And both this court and the United States Supreme Court have drawn some parallels between regulatory takings, particularly those that are temporary in duration, and temporary flooding claims. Because in both those instances, you are acting a taking on a property interest without taking title or depriving the owner of those interests of either the property or the right. And in that case, they talked about, there was a California law, and the California Supreme Court had ruled, if you have a regulation that takes a property interest from you, in that case it was the right to develop certain property that was along a riverbed in a canyon, then you have to wait until that ordinance is overruled or ruled unconstitutional before it constitutes a taking. And before you get compensation, it limited their remedy. And the U.S. Supreme Court in First English Evangelical said, no, you can't do that. A taking is a taking, and you're entitled to just compensation from that moment forward until the taking is no more, to have your damages paid. In that way, First English Evangelical, U.S. Supreme Court jurisprudence, is instructive to us about this extra protection that the Illinois Constitution provides, damages. If you're going to construe all temporary flooding simply as damages, you are effectively denying Illinois residents their rights to seek compensation for a constitutional violation because the Tort Immunity Act would take that away. It's manifestly unjust. It can't be the reasoning here. The other reasoning is that, in coming back to my original point, under Kibayes and under the limited lockstep, the only basis to depart from lockstep, particularly with regard to the Fifth Amendment and the corresponding section, Article I, Section 15 of the Illinois Constitution, is if you're going to give more protections. That was reaffirmed by this honorable court in Hope Clinic v. Flores, where, in 2013, you said, limited lockstep is not a surrender of state sovereignty nor of the states of this court's analysis regarding lockstep with federal jurisprudence, but it says this court is free to independently construe to provide more protections, but not less. And the U.S. Supreme Court jurisprudence on this fact is pretty clear, and when you talk about the arguments that the opponents have raised in their own briefs, one, and in particular I think this is raised in Pratt, that a taking has to be permanent in order to qualify as a taking. That was rejected. Once a government's action has worked a taking on a property, no subsequent action by the government can relieve it of the duty to provide that compensation. And again, a lot of these takings claims revolve on the just compensation claim, because if you have a takings but you don't get your remedy, then your constitutional right has not been protected. And certainly I raised the Tort Immunity Act. No act of legislation, no legislative act, can deprive you of your constitutionally guaranteed rights. And that's even true when there's a compelling... Would that be your argument then, if the Tort Immunity Act were raised as an action for damages? Well, my argument, Your Honor, just to clarify, is that an action for damages, if it's not a taking, again, I believe a court has to make a determination first. And that's what Arkansas Game and Fish says. You can't have a blanket exemption. A court has to actually analyze the facts and make a determination whether a taking has occurred or not. And only if a taking has not occurred do we then proceed to the damage analysis. But my position is a damage is still a constitutional claim and is exempt from the Tort Immunity Act. And if it's not, that can't be, because then you'd have the Tort Immunity Act in violation of the Just Remedy Clause of Article I, Section 15, or the Fifth Amendment of the U.S. Constitution, which applies here with equal force pursuant to the Fourteenth and the Due Process Clause. Fourteenth Amendment, Due Process Clause. So, you know, one thing before it gets too late, my argument that I do want to address. Mr. Zabel talked about the facts of the case, brought up some other issues. You know, the facts of the cases are not before this court today. It's only the certified question. But I do have to say that the characterization that came of my client's claims is not accurate. In our case, to be as put as simply as possible, the O'Hare Airport has underneath it massive underground reservoirs called retention bases. They are operated exclusively by the MWRD. It's true during heavy rain events that these basins fill up. That's how they get it, the rain accumulates on the tarmac and goes to these underground reservoirs. When they become full, as they did in 2010, which is the locus of facts that are at issue in our case, the MWRD makes a decision. They decide that they do not want to flood the multibillion-dollar public asset of O'Hare Airport, and rather that they want to store those floodwaters on my clients, on private property. They do that by releasing tens of millions of gallons directly into these two small creeks, Salt Creek and Addison Creek, that are effectively two-mile-long drainage ditches that run from O'Hare Airport down to the Des Moines River. And when they do that, these small creeks that are no longer than a single lane of highway, no deeper than the bench that Your Honors are sitting on, go from simply being at the top of their banks, which is true during a heavy rain event, to homes three blocks away having floodwater up to their second bedrooms. And that flood happens in less than half an hour. It's not the result of rain. It's not the result of anything other than the fact that they, the MWRD, has made a decision to damage my working-class clients' homes instead of flooding the O'Hare Airport. And that's exactly the facts that they were discussing in the Supreme Court in Arkansas gaming fish, because the Army Corps of Engineers made the decision that they did not want to flood these other farmers or other interests, and they specifically released the floodwater onto the state of Arkansas' land.  what is the difference or distinction between damage and taking? Certainly, where a litigant or a claimant retains the title of property, as the state of Arkansas did in Arkansas gaming fish, they can still have a claim for taking and not damages, because in that case, their timber, they had timber interests on these lands, and when the flooding entered onto that land, it destroyed the economic viability of that timber, ruined it. And in Arkansas gaming fish, they said, that's a taking, you should get compensated for that. Here in our case, where my clients' homes were completely destroyed by this flood, even though the floodwaters retreated, the damage was permanent. And these people, many of them, I sat in their living rooms, I've talked to them, many are retirees, they had to use all of their entire life savings just to rebuild their house. And they bore all that expense on their own, because the MWRD acted in the public interest of saving O'Hare Airport. And because of that, I'm not criticizing the MWRD for doing that, they're entitled to act within the public interest. But that public interest does not defeat the premise of the takings clause to say that these people are entitled to just compensation, and that is a cost that they should not bear alone, it should be borne by the entire public. And just in closing here, this court has said that it will look to federal jurisprudence on these takings clause claims. And if you look to the Seventh Circuit, when it has interpreted the United States Supreme Court on takings claims, it has even, if you're going to talk about the facts of this case, contemplated the exact situation of where the government renders your house uninhabitable. That is a taking, not a claim for damages in Illinois, but a taking. And that's Reed versus Village of Shorewood, that's been recognized by at least half a dozen federal circuits, including the Sixth, the Tenth, and the Eleventh. So in closing, the only issue before this court is to answer the certified question. To the extent that other courts have construed practice, not to say there's a blanket exemption, that must be answered in the affirmative, that must be abolished under Arkansas Game and Fish. Thank you very much. Thank you. I listened, of course, to all of counsel's arguments, and I think both parties, by and large, argued their briefs and made some additional remarks, hopefully helpful to the court. And so the greater part of me is inclined to stand on the district's briefs, but I do want to make just two observations. I don't disagree. The district doesn't disagree with Justice Ginsburg and the Arkansas court. We just don't believe it applies to Hampton and Jaclyn, and we don't believe it's dispositive of Pratt versus Roosevelt. Again, I won't reiterate the fact that we believe that Pratt is still good law in Illinois. There's a part of me that believes that this court may be compelled  as part of its calculus in adjudicating this case. Again, I do not believe that the work of the municipalities and treatment works, including the district, is tantamount to government-induced flooding when the flooding that is complained of occurs in the context of a heavy rain event. I disagree somewhat with counsel as respects the attempt to put blinders on the court as respects to the certified question. To me, the reality is, as a point of scholarship, some examination of the facts underlying the cases that both parties are citing is arguably necessary for this court to do its work. The other observation that I want to make, apropos of some of counsel's remarks, stormwater and wastewater and units of local government and publicly owned treatment works don't discriminate. It's not often that you can, regrettably in our society, say that someone or something is discrimination-free, but I am urging to the court that that is the case in the context of rainwater, stormwater, the district and God and Mother Nature. They don't discriminate. We are all in this together. Mr. Dunn's clients are our customers. They're the customers and the taxpayers of the villages, of the three villages in which they reside. On the global scale, they are, or the customers, are all over the state of Illinois. These are our customers. These are our clients. We do, as do the municipalities and the other treatment works, we do the very best that we can with the funds that we have. Now, please don't get me wrong. I'm not urging upon you, we do the best we can as a new legal standard by any means. Obviously, both parties have argued before you what they believe the applicable legal standards are. But what I am urging upon you is that now more so than ever before, the world doesn't revolve around stormwater collection and wastewater treatment. There are other issues, obviously, but it's one that's near and dear to our heart. It's our work, our mission. What I am urging upon you is this. The district and its 125 communities and thousands of communities throughout the state do the best they can with the limited money that we have, both to maintain and operate the existing infrastructure, and hopefully, in the case of the MWRD and some of the other agencies, continue to build new things with a view toward providing relief to Mr. Dunn's clients. Let's talk about providing relief in a minute. I know it's not before us. I know the certified question is before us. But there was discussion of if this court limits it to damages that the Tort Immunity Act, although counsel says, you know, in his opinion, would not even apply in that situation, but I'm wondering what your opinion is on that. Of course, Your Honor. The district's opinion would be that it does apply and might very well be dispositive. So we're not working so hard, really, to make people whole. I mean, that's what this is about, right? If it's under the takings clause, the homeowners may stand to benefit. If it's under, at least there'd be a fight as to whether or not tort immunity would apply, and damages or not, the fact that the Illinois Constitution may provide damages, at least in this instance, with the water reclamation, it might be a distinction without merit. Damages are applied, but you're not getting any. Yes, Your Honor. That's where we're at. That's carried. Justice Freeman, he's asked a couple of times what difference does it make, you know? What difference should it make to the plaintiffs? Well, it's the difference between recovery and, at least in your opinion, no recovery. That's correct, Your Honor. That's arguably correct. The only, just by way of conclusion, again, the bottom line is these agencies cannot provide this service if the available funds are diminished for the purpose of the private payments. And I ask that that form some part of the court's calculus in adjudicating this. Any further questions? I don't think so, Counsel. Thank you. Thank you, Your Honor. Thank you. Case number 119861, Janice Hampton et al. versus the Metropolitan Water Reclamation District of Greater Chicago will be taken under advisement as agenda number 10. Mr. Zabel, Mr. Dunn, thank you for your arguments this morning. You're excused at this time. Mr. Marshall, the court stands adjourned until 9.30 a.m. on March 22nd.